**ATLANTIC COAST LINE RAILROAD COMPANY, Appellant,**

v.

**E. T. TRUETT, as Administrator of the Estate of Donald Truett, deceased, Appellee.**

**No. 7495.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 25, 1957.

Decided Nov. 7, 1957.

Hugh L. Willcox, Florence, S. C. (Willcox, Hardee, Houck & Palmer, Florence, S. C., on the brief), for appellant.

George W. Keels, Florence, S. C., for appellee.

Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.

SOBELOFF, Circuit Judge.

An eighteen-month-old child, Donald Truett, was struck and killed by a train of the Atlantic Coast Line Railroad at a point where its tracks cross a public highway in Cartersville, South Carolina, and from a judgment for $6,250, recovered by the father as administrator in an action under Lord Campbell's Act, Code 1952, §§ 10–1951, 10–1952, 10–1954, this appeal was taken. The sole contention raised is that the case should not have been submitted to the jury, and that the defendant's subsequent motion for judgment *non obstante veredicto* or, in the alternative, for a new trial, should have been granted.

The railroad defended on two grounds, the absence of negligence on its part, and contributory negligence of the child's parents.

The child's home was located about 300 feet from the railroad crossing. According to the father, the mother had been confined to bed by illness for the preceding five or six weeks, and he had just before the accident prepared her meal and taken it into her bedroom. The child, he said, was playing with older children in the yard, within five minutes before it met its death on the track. How it got to the crossing, whether it was led by another child or wandered off, is not known.

Although several acts of negligence were claimed, the only one now relied on by the plaintiff is that the train crew failed to keep a proper lookout. But for this, the plaintiff maintains, the child could have been seen for a sufficient distance to enable the crew to avoid the disaster.

It is undisputed that the track is straight and practically level, and the view unobstructed for more than a mile as one approaches the crossing where the child was killed. It was a bright, sunny afternoon in July, and there was testimony on behalf of the plaintiff that the child could have been seen at a distance of one-half mile, or 2,640 feet. The engineer testified that when he reached a whistle post, located 1,500 feet from the crossing in question, he blew the whistle. At about this time, he and others of the crew noticed a boy on the track at or near the crossing where shortly thereafter the infant was struck. They saw this boy, who seemed to be six to nine years old, get up and walk off. Later in his testimony the engineer said that when he observed this, the train was 2,000 feet from the crossing. This witness further said: "After he walked off, I saw an object move in the middle of the track, and I

thought it to be a dog at the time it moved; and in a very short period of time I realized it was a child." The brakeman testified that he at first thought the object remaining on the track was a piece of paper. It was testified by the crewmen that they did not actually recognize what it was till they saw the infant stand up at the crossing and start toddling off to the left. They judged that they were then within approximately 500 to 700 feet of him, and that although they put the train in emergency, it was too late.

The train stopped within approximately 2,000 feet, at a point estimated to be 1,500 feet beyond the crossing. The fact that the train travelled such a distance is explained in part by the suggestion that beyond the intersection there is a slight downgrade, although the track is level or very slightly upgrade (only four feet to a thousand), as the intersection is approached, with the intersection itself at the crest. The fireman admitted that if the engineer had reduced speed at 1,500 to 2,000 feet ahead of the crossing, the train could have been stopped in a shorter distance. A retired engineer, called by the plaintiff, testified that a train, consisting as this did, of two diesels and a cab, could have been stopped within 1,500 feet. The engineer who operated the train testified that at the speed the train was going, 45 to 50 miles per hour, he could not stop it in less than 2,000 feet.

He admitted, however, that when he saw the first boy he did not reduce speed, thinking that the crossing was cleared by the boy's departure. The railroad itself offered testimony that children habitually played on the track at or near this crossing, despite warnings by railroad employees, including members of this crew. The plaintiff argues that, being aware of this practice and seeing one child leave the track, the crewmen should not have assumed, while traveling a distance of 1,000 to 1,500 feet (according to the fireman's estimate), that the object ahead was not a child, but that they should have acted before they did to reduce speed and bring the train under control. The railroad contends that seeing the older child leave the track was a reassuring circumstance, while the plaintiff insists that it should have alerted the crew to the possibility of other children nearby.

It was suggested in argument that even if the train could not have been stopped before it reached the crossing, yet if its speed had been reduced sooner, the child might have reached a point of safety before the train came to the crossing.

■ Distilling the essential truth from a raw mixture of circumstances is the fact finder's function, and the jury is the instrument our system provides for this purpose. If there is any room for rational choice between conflicting facts or competing inferences, the task is for the jury. The debate as to whether those who operated the train kept a proper lookout in the circumstances here present was properly submitted to the jury for decision. See Magill v. Southern Ry. Co., 1913, 95 S.C. 306, 78 S.E. 1033; Williams v. Greenville S. & A. Ry. Co., 1916, 103 S.C. 321, 88 S.E. 131; Key v. Charleston & W. C. Ry. Co., 1928, 144 S.C. 164, 142 S.E. 336; Jones v. Atlanta-Charlotte Air Line Ry. Co., 1951, 218 S.C. 537, 63 S.E. 2d 476, 26 A.L.R.2d 297; Miller v. Atlantic Coast Line R. Co., 1954, 225 S.C. 217, 81 S.E.2d 335.

■ The defendant pointed out certain eccentricities of manner and expression of the retired engineer who testified for the plaintiff, and argued with great earnestness that on its face his testimony was so extreme and irresponsible that it should have been disregarded by the District Judge in determining the sufficiency of the evidence to raise a jury question. We think that these considerations could properly be addressed, as they doubtless were, to the jury which heard and observed the witness on the stand. It was not for the District Judge and it is not for us to undertake an appraisal of the witness' credibility. Moreover, his testimony was not crucial, for as we have seen, the testimony offered by the railroad's own witnesses furnished an independent basis for submission of the case to the jury.

As to the question of the parents' contributory negligence, which under South Carolina law would be imputed to the child, this too was a jury question. Cirosky v. Smathers, 1924, 128 S.C. 358, 122 S.E. 864; Horne v. Atlantic Coast Line R. Co., 1935, 177 S.C. 461, 181 S.E. 642. Cf. Whitehead v. Atlantic Coast Line R. Co., 1929, 153 S.C. 339, 150 S.E. 769. What precautions may reasonably be expected of parents living in the circumstances shown in this case, is a matter for the judgment of the jury. The permissible inferences do not point so clearly and indisputably to parental negligence as to require a directed verdict as a matter of law.

Affirmed.